# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 2:10-CR-158-PPS-APR-2 |
| v. | ) | |
| | ) | |
| JUAN C. RAMIREZ-FUENTEZ | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Defendant Juan C. Ramirez-Fuentez moves to suppress evidence obtained pursuant to a warrantless search of his home, including a written confession he signed several hours after the search, on the ground that he was unlawfully detained. [DE 26]. But because the encounter with the police was consensual, and the Defendant voluntarily consented to the search, the motion to suppress is denied.

## BACKGROUND

Ramirez is charged with one count of possession with intent to distribute methamphetamine, two firearms charges and an immigration violation [DE 17]. Ramirez's motion to suppress concerns evidence obtained pursuant to an August 23, 2010 search of his residence. I'll start with the facts as adduced at the suppression hearing where the following four witnesses testified, all called by the government: Cook County Sheriff's Officer Reyna, Special Agents Lonnie Urban and Mark Zuder from the Department of Homeland Security and U.S. Pretrial Services Officer Laura Marquez.

On August 23, 2010, several federal agents and members of the Cook County Sheriff's Department, including Zuder, Reyna, and Urban, were conducting surveillance at Ramirez's

home in Hammond, Indiana.  Two other federal agents, Goff and Conforti, were also present.  A confidential informant had previously provided the agents with the license plate number of a vehicle allegedly used to sell narcotics and handguns, and it was later determined that the vehicle was registered to Ramirez.  The officers had also observed Ramirez driving the vehicle and the vehicle parked outside his residence.

Once the decision was made to approach the residence for a "knock and talk," agent Zuder called the Hammond Police Department for backup.  The surveilling agents displayed badges on their belts, were wearing vests prominently marked with police insignia, and were carrying holstered guns.  But their cars were unmarked, and Zuder wanted marked police cars on the scene before approaching the residence.

At approximately 5:50 p.m., two Hammond police officers arrived in response to Zuder's call.[1]  Agent Zuder briefly explained the operation to them, and he and Urban then approached the back door of the residence and knocked two-or-three times.  (Photographs admitted at the hearing show that, because Ramirez's home is a trailer, and is located in a trailer park, there is little difference between the front door and the back door and it is difficult to tell which is which).  At this point, Goff, Conforti and Reyna were also positioned at the back door, near the stairs leading up to the back porch.  After hearing no response, agents Zuder and Urban moved to the front door and Zuder knocked again.  No one responded, so Zuder and Urban returned to

_____

[1] Ramirez contends in his memorandum that the police came to his door instead around 4:30 p.m. [DE 27 at 2, n.2].

the back door and knocked once more. At that point, a figure inside, who turned out to be Ramirez, asked, "Who is it?" and Zuder responded "police." Ramirez then opened the back door, explained that he had been in the bathroom, and apologized for not hearing the door. Zuder confirmed Ramirez's identity, and he and Urban showed Ramirez their badges. At that point, Zuder asked Ramirez if he understood English, to which Ramirez replied, "a little bit."

Still standing outside the back door, Zuder explained to Ramirez that the police had information that guns were being sold from Ramirez's residence. Ramirez replied that he was not selling guns. Zuder then asked – just once – for permission to come in, which Ramirez granted. Zuder, Urban and Reyna followed Ramirez into a laundry area just inside the back door. Zuder and Reyna followed Ramirez down the hall, about 30 feet from the laundry area, to a kitchen area. Zuder sat with Ramirez at a table there, with Reyna standing next to the table. The other agents who had entered the residence, remained at the laundry area, out of sight of Zuder and Ramirez.

Zuder testified that, up to this point, all of the conversation with Ramirez was conducted in English with Ramirez responding in English, including Zuder's request for permission to enter and Ramirez's affirmative response. Zuder added that once he sat down at the table with Ramirez, Zuder continued to speak to Ramirez in English with Reyna interpreting in Spanish. Ramirez then responded sometimes in English, and sometimes in Spanish with Reyna interpreting.

Zuder's  testimony on the issue of when Reyna began interpreting differs somewhat from the testimony given by Reyna.  Specifically, Reyna testified that he began interpreting for Ramirez at the point where Zuder explained to Ramirez why the police were at his door, which is a conversation that took place at the back door, before Zuder and Reyna followed Ramirez to the kitchen area.  Reyna, however, never testified that Zuder requested permission to enter.  On the contrary, Reyna testified that Ramirez invited the police inside because he did not want the neighbors to see, as opposed to in response to a request from Zuder.  I will return to this discrepancy when I analyze the voluntariness of Ramirez's consent to enter.

There is no disagreement, however that Reyna was interpreting everything once Zuder and Ramirez were seated.  And at this point, Zuder reiterated that the police had information that Ramirez was selling guns.  Ramirez denied it but acknowledged that he had two guns in his bedroom.  Zuder asked Ramirez for permission to search, which Ramirez verbally granted.  Afterwards, Urban and Goff proceeded to search the residence, while Agent Conforti went to retrieve an English-language consent form from his car.

 The search yielded approximately $9,000 in cash, some ammunition, a small amount of cannabis, two nine-millimeter guns, a scale with cocaine residue on it, and a ledger inside of a shoe box.  After Ramirez was confronted with these items, Reyna read him his Miranda rights.  Ramirez then asked Zuder if the agents had a search warrant.  Zuder replied that they did not, and offered to stop searching if Ramirez wished.  Ramirez, however, indicated that the police could continue to search, and that he had nothing to hide.  At some point during the search,

Zuder requested a canine from the Hammond police to assist in the search.[2]

Once Agent Conforti returned with the one-page consent form [DE 39, Pl. Ex. A], Zuder asked Reyna to translate it line-by-line for Ramirez. Ramirez signed the form at the kitchen table, and Zuder and Reyna signed as witnesses. Zuder marked the time for this as 6:05 p.m., in the space provided on the form [*Id.*]. A space is provided at the top of the form for a description of the property to which the consent applies. That space was left blank on the copy of that form that the government attached to its response to the Motion to Suppress [DE 30-1], although Ramirez's address still appears on another section of that form. Confusingly, the government has submitted into evidence what appears to be the original signed consent, which, for reasons that are unclear, contains Ramirez's address in the space that was left blank on the copy of that form attached to the government's response [DE 39, Pl. Ex. A].

Ramirez then volunteered to write a statement. In it, he said that the money found in the his home had come from a food stand that he helped operate [DE 39, Pl. Ex. B]. Zuder signed this form as a witness and marked the time as 6:05 p.m., the same time that appears on the consent form. Around this time, Ramirez's wife, Yadira Ramirez, pulled up to the residence with her two daughters, and Zuder and Urban went outside to speak with her. Ms. Ramirez told Urban that any proceeds from the food stand were hers, and that she deposited such proceeds

---

[2]The evidence of the timing of the canine search request is unclear. Zuder's testimony that he requested this during the search, which he testified occurred after 5:50 p.m., conflicts with the 4:53 p.m. time stamp on the canine utilization history report [DE 39, Def. Ex. 3]. The government was not able to explain this apparent discrepancy at the hearing.

into a bank account.  She also explained that her brother, Jamie Ramirez-Fuentez, ran the food stand that Ramirez had referenced, and that her brother was, at that moment, operating it down the street from Ramirez's residence.  Ramirez was then placed in Conforti's unmarked car while Zuder and the other agents went to question Jaime Ramirez-Fuentez.  (To avoid confusing him with the defendant, I will refer to Jaime Ramirez-Fuentez as simply "Jaime.")

Zuder, Urban and Reyna approached Jaime at the food stand, and Zuder asked him for identification and his immigration status.  Zuder immediately saw that Jaime did not speak English; so Reyna interpreted, as he had earlier done with Ramirez.  Jaime admitted to Zuder that he was born in Mexico and was an undocumented alien.  He also admitted to having illegal firearms at his residence.  Ramirez remained in the car during this exchange, out of Jaime's sight.  Jaime then voluntarily consented to a search of his residence, and provided Zuder with the keys along with a consent to search.

Jaime was read his Miranda rights in the car as the officers drove to his residence to conduct the search.  The search turned up more than eight pounds of crystal methamphetamine, two loaded firearms, and a number of fake identification cards.  Zuder confronted Ramirez with these items, asking him whose prints would turn up on the drugs.  Ramirez admitted that his prints would show up.  Evidently to soften the blow of impending charges, Ramirez began cooperating with the agents.  He placed consensually monitored calls from Jaime's kitchen, but ultimately the calls did not lead to further arrests.

Zuder and Urban transported Ramirez to the Cook County Sheriff's lock-up facility in

Maywood, Illinois. At approximately 11:00 p.m., Ramirez was placed in an interview room with Zuder, Reyna and Officer Kane, where Reyna continued to provide interpretation. Ramirez was again Mirandized, this time by Kane, using a Spanish language version of the Sheriff's Department advice of rights form [DE 39, Pl. Ex. C]. Ramirez indicated that he understood his rights. He placed his initials next to each line on the form and then agreed to give a written statement. Kane questioned Ramirez while Reyna recorded Ramirez's responses onto a written statement form, translating them to English. Reyna then translated the statement back to Ramirez in Spanish, and Ramirez signed every page of the four-page statement [DE 39, Pl. Ex. D].

## DISCUSSION

Ramirez seeks to suppress all the evidence recovered from the search of his home, and everything that flowed from it, including the written statement he made at his home and the written confession he signed later that night. Ramirez argues that this evidence should be suppressed because he was unlawfully detained at the door of his residence, and because the subsequent search was conducted without his voluntary consent.

The Fourth Amendment protects citizens from unreasonable searches and seizures, and warrantless searches are presumptively unreasonable under the Fourth Amendment. The prohibition on warrantless searches, however, does not apply to situations in which voluntary consent has been obtained from the individual whose property is searched. *U.S. v. Bell*, 500 F.3d 609, 612-13 (7th Cir. 2007); *U.S. v. Strache*, 202 F.3d 980, 984 (7th Cir. 2000). Whether

consent to search is voluntary on the one hand or coercive on the other is a question of fact to be determined by examining the "totality of all the circumstances." *Strache*, 202 F.3d at 985 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). The determination of whether consent was voluntary does not depend on the "presence or absence of a single controlling criterion but instead requires careful scrutiny of all the surrounding circumstances." *Id.* (citation and quotation marks omitted). The burden is on the government to prove that a person's consent was voluntary. *Id.* at 984.

## I.     The Entrance into Ramirez's Residence

Ramirez argues that the police had no right to enter his residence in the first place because he refused consent to enter. Ramirez didn't testify at the hearing, but he says in his brief that when he answered the back door, the police told him they wanted to search the house, and when Ramirez turned to walk back inside, he was ordered to stop, raise his hands, and not shut the door. Ramirez argues that these facts, along with the number of officers who entered his home, and the fact that Ramirez was not told he was not under arrest, show that he was unlawfully detained.

As an initial matter, Zuder and the other surveilling agents did not need probable cause to approach Ramirez's residence and ask to speak with the occupant. The technique they used, commonly called a "knock and talk," occurs when officers approach a residence where they suspect illegal activity is occurring, knock on the door, and attempt to gain consent to enter. *U.S. v. Adeyeye*, 359 F.3d 457, 461 (7th Cir. 2004). This is a permissible police procedure that does

not require probable cause or even reasonable suspicion. *Id.*; *see also U.S. v. Johnson*, 170 F.3d 708, 711 (7th Cir. 1999) (discussing "knock and talk" technique); *U.S. v. Jerez*, 108 F.3d 684, 689 (7th Cir. 1997). There is no seizure of the person in such circumstances unless a reasonable person would not have felt free to decline the officers' request or otherwise terminate the encounter. *Adeyeye*, 359 F.3d at 461 (citing *Jerez*, 108 F.3d at 689). The reasonable person standard is an objective one and "is made on the basis of the 'totality of the circumstances' surrounding the encounter." *Jerez*, 108 F.3d at 690 (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). If a reasonable person would have felt free to terminate the encounter, the encounter was consensual, and the Fourth Amendment is not implicated. *U.S. v. Clements*, 522 F.3d 790, 794 (7th Cir. 2008).

The number of police officers involved in this encounter does not, standing alone, show that a reasonable person would not have felt free to terminate the encounter. The Seventh Circuit has found that "the number and threatening presence of officers" is one of several considerations that might indicate a seizure. *Carlson v. Bukovic*, 621 F.3d 610, 619 (7th Cir. 2010) (citing *U.S. v. Mendenhall*, 446 U.S. 544, 554-55 (1980)). But Ramirez does not indicate, and the Court is unaware of, any authority that the number of officers involved in an investigation can be coercive in itself. And at least two federal courts of appeals have held that the mere presence of multiple officers in a confined space is not inherently coercive. *See U.S. v. Thomas*, 430 F.3d 274, 280 (6th Cir. 2005) (number of officers involved in five-officer investigation "was neither inherently coercive nor unjustified"); *U.S. v. Zamoran-Coronel*, 231

F.3d 466, 469 (8th Cir. 2000) ("the mere presence of [four] police officers in a confined space does not necessarily exert coercion of a constitutionally-defective nature").

The claim in Ramirez's brief that the officers ordered him to stop, raise his hands, and not close the door, would (if true) be much more troubling. But these contentions are refuted by the uncontradicted evidence at the hearing. Ramirez did not testify at the hearing; Reyna, Zuder and Urban all did. And none testified that Ramirez turned away at the door, or that he was ordered to stop, not close the door, and raise his hands. Indeed, none of the agents testified that Ramirez was ever given any orders, or that any of the officers ever raised his voice with Ramirez. On the contrary, Reyna, Zuder and Urban all credibly testified that Ramirez gave verbal consent to enter his residence. And Zuder testified that his speaking voice with Ramirez remained calm and conversational throughout the encounter.

Ramirez's claim that the police failed to advise him that he was not under arrest also does not show that he was unlawfully detained. Whether the police inform a person that he is not under arrest is certainly probative of whether a reasonable person would have felt free to terminate an encounter. *U.S. v. McCarthur*, 6 F.3d 1270, 1276 (7th Cir. 1993) (citing *U.S. v. Edwards*, 898 F.2d 1273, 1276 (7th Cir. 1990)). But the police are not required to inform a person, in *Miranda*-like fashion, that he is not under arrest. *U.S. v. High*, 921 F.2d 112, 115 (7th Cir. 1990).

Moreover, any degree to which the failure to inform here may weigh in Ramirez's favor is far outweighed by other considerations, including that the encounter occurred in daylight

(which is less intrusive than at night), the knocks at the back and front doors were not prolonged, no one asked or commanded Ramirez to open the door, the police asked just once for permission to enter, and, as Zuder testified, the tone and language of the encounter was calm and conversational throughout. *Cf. Carlson*, 621 F.3d at 619. That is what makes this case different from cases like *Adeyeye*, 359 F.3d at 462, where because of the late hour, prolonged knocking, and commands to open the door, the Seventh Circuit held that the consensual encounter was transformed into seizure.

As I noted earlier, the evidence is unclear as to whether Reyna translated Zuder's request for permission to enter from English to Spanish. Zuder's testimony is that, up to the point where Ramirez sat with Zuder at the kitchen table, the conversation, including the request for permission to enter, was in English. Reyna, on the other hand, testified that he began translating at the time that Zuder explained to Ramirez why the police were at his residence. But this is an exchange that, according to Reyna, occurred at Ramirez's back door. So Reyna's testimony would imply that Zuder's request for entry was also translated, except that Reyna also testified that Ramirez invited the police inside on his own, rather than in response to a request for entry.

But even assuming that Reyna did not translate Zuder's request for entry, the testimony from Zuder and Reyna as to their observations of Ramirez's ability to understand English satisfies me that Zuder's request did not need to be in Spanish to prevent an unlawful detention. As noted, the test for whether Ramirez was unlawfully detained is an objective one—that is, whether a reasonable person would have felt free to decline the request or otherwise terminate

the encounter. *Adeyeye*, 359 F.3d at 461. Zuder testified that he was confident that Ramirez

spoke English because (i) Ramirez voluntarily spoke only English at the back door, including

when he apologized for being in the bathroom; (ii) Zuder could understand the English that

Ramirez was speaking to him; and (iii) Ramirez's responses to Zuder's questions were

appropriate. Reyna, a native Spanish speaker, also testified that the conversation on the back

porch led him to believe Ramirez understood English because Ramirez continued to speak and

respond in English.

I find this testimony credible despite the above-noted minor discrepancies between

Zuder's and Reyna's testimony, which the Court believes result from flaws of memory as

opposed to a purposeful attempt to mislead me. *See U.S. v. Huebner*, 356 F.3d 807, 813 (7th Cir.

2004) (upholding credibility finding despite minor inconsistencies amidst officers' otherwise

consistent testimony). And, anyway, the discrepancies are largely immaterial to the analysis

here. That is, based on this testimony, I find that Ramirez understood English well enough to

know that Zuder was requesting permission to enter, whether or not Reyna translated, and that a

reasonable person standing in Ramirez's shoes would have felt free to refuse this request. *Cf.*

*U.S. v. Navarro*, 90 F.3d 1245, 1256-58 (7th Cir. 1996) (consent to search was voluntary when it

was given in a "calm and relaxed" atmosphere and defendant had signed a consent form that

stated "I sign this form freely and voluntarily," despite defendant's claim that he did not

understand English well); *U.S. v. Mustapher*, 459 F. Supp. 2d 752, 758 (N.D. Ill. 2006)

(defendant's adequate understanding of spoken English made him fully capable of giving

voluntary consent when he signed the consent-to-search form, despite limited understanding of written English).

Accordingly, based on the totality of the circumstances, I find that Ramirez was not unlawfully detained at the door of his residence. The Court thus rejects Ramirez's argument that he was seized in violation of the Fourth Amendment.

## II.     Consent to Search Ramirez's Residence

The next issue is whether Ramirez verbally consented to a search of his residence, and whether he signed a written consent to search form a short while later.

While warrantless searches are *per se* unreasonable under the Fourth Amendment, it is "well-settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *U.S. v. Garcia*, 897 F.2d 1413, 1419 (7th Cir. 1990) (quoting *Schneckloth*, 412 U.S. at 219). The government bears the burden of proving that consent was freely and voluntarily given. *Id.* The question of voluntariness is a question of fact to be determined by the totality of the circumstances surrounding the consent. *Id.*; *see also U.S. v. Raibley*, 243 F.3d 1069, 1075 (7th Cir. 2001).

Factors in assessing voluntariness include things like the person's age, intelligence and education. *Id.* at 1075-76; *Strache*, 202 F.3d at 985; *Zamoran-Coronel*, 231 F.3d at 469-70 (8th Cir. 2000); *U.S. v. Zuiba-Melendez*, 263 F.3d 1155, 1163 (10th Cir. 2001). The consent may be express or implied, but need not be knowing and intelligent, and may be given unintentionally and without knowledge of the right to refuse consent. *Schneckloth*, 412 U.S. at 235-36; *U.S. v. Saadeh*, 61 F.3d 510, 518 (7th Cir. 1995) (consent to search was voluntary even though suspect was not informed of right to refuse consent).

I find that the government has met its burden of proving that Ramirez freely and voluntarily consented to the search of his residence. Reyna, Urban and Zuder all gave uncontradicted testified that Ramirez gave verbal consent to the search, after Zuder requested permission. Reyna translated this request for Ramirez in Spanish, Ramirez's native language, as he did during the entire encounter once Ramirez invited the police into his residence. Reyna further testified that Ramirez voluntarily signed a written consent form, which Reyna first translated line-by-line for Ramirez. Moreover, before signing the written consent form, Ramirez had asked the police whether they had a warrant. Zuder responded by telling Ramirez that they did not, that Ramirez had a right to refuse consent, and that they would terminate the search, if Ramirez requested it. Zuder and Reyna further testified that Ramirez then told the officers to go ahead with the search.

In his motion to suppress, Ramirez denies signing the written consent form, and invites the Court to compare the signature on that form [DE 39, Pl. Ex. A] with Ramirez's signatures on the voluntary statements he made at his home, and later at the Maywood facility [DE 39, Pl. Exs. B & D, respectively]. There are subtle differences in the signatures that appear on each of these forms, including differences as between what Ramirez admits are his signatures on the two voluntary statements [DE 39, Pl. Exs. B & D]. Still, the signature on the written consent form appears to be the same as those on the other forms. And the subtle differences between the signatures on the consent form and the voluntary statements can reasonably be attributed to a number of factors, including the time difference between the signing of the consent form (6:05 p.m.) and the signing of the voluntary statement(approximately 11:00 p.m.), the stress of the occasion, or even a purposeful deviation by Ramirez. In any event, the Court finds that the

signatures are not so different that reasonable minds could not agree that they were made by the same hand, particularly given the uncontradicted testimony from Reyna and Zuder that Ramirez signed the consent form.

Ramirez also points to the supposedly suspicious timing of the consent form as evidence that he did not sign it. The consent form indicates that it was signed by Ramirez, and witnessed by Zuder and another agent, at 6:05 p.m. [DE 39, Pl. Ex. A]. Ramirez correctly points out that the voluntary statement he completed at his residence also bears a 6:05 p.m. time indicator [DE 39, Pl. Ex. B]. Ramirez contends that these documents could not have both been completed at 6:05 p.m., and invites the Court to find that this shows that he did not sign the written consent form. But I fail to see how identical time entries on documents that were likely signed no more than a few minutes apart raises any doubts as to the authenticity of Ramirez's signature, much less as to the voluntariness of the search.

Ramirez also invites the Court to find that the search was involuntary based on the fact that the police did not fill in the blank on the consent from describing the address to be searched. As I noted earlier, Ramirez's address already appeared in another location on that form [DE 39, Pl. Ex. A]. So supplying this address again, in the appropriate blank, would not have provided Ramirez with any additional information about the scope of the area to be searched. Moreover, in determining the scope of a consent search, the relevant question is "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *U.S. v. Raney*, 342 F.3d 551, 556 (7th Cir. 2003). Zuder and Reyna testified, and the Court believes, that Ramirez verbally consented to a search of his residence before signing the form. It would have been objectively unreasonable for Ramirez to believe that by later signing a form that

-15-

showed his address only once, and not twice, he somehow limited the scope of, or negated, this verbal consent.

What's more, a determination of voluntariness "does not ride on the presence or absence of a single controlling factor." *U.S. v. Figueroa-Espana*, 511 F.3d 696, 704-5 (7th Cir. 2007) (quoting *U.S. v. Johnson*, 495 F.3d 536, 541 (7th Cir. 2007)). So even if the timing of these documents, and the above-noted discrepancies in some of the documents relating to this search, is mildly suspicious in the aggregate, the uncontradicted testimony convinces me that no compulsion occurred here.

Finally, during the hearing, Ramirez suggested that Reyna had interpreted Zuder's request for permission to search as a request for permission to "look around," implicitly asking the Court to find that law enforcement officers must actually use the word "search" when seeking consent. Such a requirement is unnecessary and not supported by the law. The Seventh Circuit has been flexible with the language used by law enforcement officials when requesting consent to search. *See Strache*, 202 F.3d at 985 (defendant consented to full search of bedroom by saying "go ahead" when police asked if he minded whether they "took a look" at items in bedroom); *U.S. v. Rice*, 995 F.2d 719, 720-24 (7th Cir. 1993) (providing consent to "look around" room authorized search of room, including small bag contained therein); *U.S. v. Berke*, 930 F.2d 1219, 1222 (7th Cir. 1991) (providing consent to "look" into the bag authorized full search of the bag and its contents).

So even assuming Reyna did not use the Spanish equivalent of the magic word "search," the request for consent, when viewed in context, including Zuder's offer to step searching, demonstrates that a reasonable individual would recognize that Zuder was requesting permission

to search the residence. The Court therefore declines to find that the use of words other than "search" (*i.e.*, "look around") in a request for consent eliminates the voluntariness of the consent.

In sum, based on my review of the totality of the evidence, I find that Ramirez's verbal and written consent to the search of his residence was free and voluntary.

\* \* \*

Because I find that Ramirez was not seized and that he voluntarily consented to the search of his house, I need not reach the government's alternative argument that the written confession which followed the search is exempt from the exclusionary rule based on the attenuation doctrine. It's enough to note that the government, in its response and argument during the motion hearing, has preserved this issue for appellate review, if necessary.

## CONCLUSION

On this record, the Court cannot find any violation of Ramirez's rights under the Fourth Amendment. Accordingly, defendant Juan C. Ramirez-Fuentez's motion to suppress evidence [DE 26] is **DENIED**.

**SO ORDERED.**

ENTERED:  February 23, 2011

<u>s/ Philip P. Simon</u>
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT